IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD W. MALLARDI, | ) | Case No. 5:23-CV-01364 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Richard Mallardi ("Mallardi"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying applications for DIB and SSI be affirmed.

## II.      Procedural History

Mallardi filed for DIB on August 29, 2019, and for SSI on September 12, 2019, alleging a disability onset date of December 1, 2007. (Tr. 166, 168). The claims were denied initially and on reconsideration. (Tr. 57-73, 76-91). He then requested a hearing before an ALJ. (Tr. 116-17).

Mallardi and a vocational expert ("VE") testified before the ALJ on September 1, 2020. (Tr. 29-54).

On October 9, 2020, the ALJ issued a written decision finding Mallardi not disabled. (Tr. 12-27). The Appeals Council denied his request for review on July 23, 2021. (Tr. 1-3). The matter was appealed to the District Court, and, after a stipulated remand, was returned to the Agency on April 12, 2022 for further decision. (Tr. 739). Another hearing before the ALJ was held on February 2, 2023, including a VE and a Medical Expert ("ME"). The ALJ issued a second written decision on March 29, 2023 finding Mallardi not disabled, making the second hearing decision the final decision of the Commissioner. (Tr. 670-738; see 20 C.F.R. §§ 404.984, 416.483). Mallardi timely filed this action on July 14, 2023. (ECF #1).

## III.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mallardi  was 39 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 682). He graduated from high school. (*See id.*). In the past, he worked as a broadcaster and producer. (*Id.*).

### B.     Relevant Medical Evidence

On March 12, 2015, Mallardi had a sleep study performed by Christopher Rucker, M.D. (Tr. 366-67). Dr. Rucker assessed him with moderate to severe obstructive sleep apnea and recommended use of a CPAP machine. (Tr. 367).

On January 14, 2019, Mallardi met with Dr. Rucker for a wellness check. Treating notes indicate he presented with diabetes, hypertension, off-and-on lower back pain, tingling and numbness in his wrist and hand, sleep apnea, and depression and anxiety. (Tr. 269). Mallardi described his depression and anxieties as "crippling" and he had only been able to attend two

recent social events. (*Id.*). Dr. Rucker started Mallardi on hydrochlorotiazide-losartan for his hypertension, encouraged healthy diet and exercise, restarted use of BiPAP machine, and started venlafaxine extended release for mood control.  (Tr. 271-73).

On April 22, 2019, Mallardi met with Hoai-Nghia Nguyen, M.D. to establish care. (Tr. 428). Dr. Nguyen assessed him with hypertension, high cholesterol, obesity, PTSD, and obstructive sleep apnea. (Tr. 434). She continued him on venlafaxine extended release and losartan potassium-hctz, with instructions to keep his appointment with the psychiatrist the next day, obtain lab work, and return for follow-up in one month. (Tr. 435).

At follow up with Dr. Nguyen on May 30, 2019, Mallardi reported he had not gone for an overnight sleep study but was taking his medications as prescribed. (Tr. 422). After reviewing his lab work, Dr. Nguyen started Mallardi on Zetia 10 mg for high cholesterol and recommended follow up in one week. (Tr. 422, 426-27).

On June 14, 2019, Mallardi attended an intake assessment at Portage Path Behavioral Health for medication management to support his counseling services through Greenleaf. (Tr. 438-47). During the assessment, Mallardi described having at least 10 suicide attempts, with the most recent a few days before Christmas 2016, resulting in a psychiatric hospitalization. (Tr. 441). He denied suicidal intent or plan at the time of the interview. (*Id.*). Mental status examination was normal with no reported cognitive impairments, appropriate affect, cooperative behavior, euthymic mood, and good insight and judgment. (Tr. 443-44). His primary diagnoses were major depressive disorder, generalized anxiety disorder with panic attacks, unspecified trauma and stressor related disorder. (Tr. 445). This diagnosis was updated by Wendy Barnett, M.S.N., R.N., P.M.H.N.P.-BC on June 20, 2019, to include bipolar I disorder, polysubstance abuse disorder, and unspecified trauma and stressor related disorder. (Tr. 448-49).

Mallardi met with NP Barnett on June 19, 2019, describing his depression at an eight and his anxiety at a six on a ten-point scale, with sporadic sleep and racing thoughts. (Tr. 450). He disclosed to NP Barnett a history of manic episodes starting when he was a teenager; after the manic episodes, he would fall into a severe depression. (Tr. 451). He had been on Effexor but no mood stabilizers. (*Id.*). During one manic episode, he was up for days, had paranoid delusions, and abused a friend, resulting in a prison sentence. (*Id.*). He denied current impulsivity, violence, irritability, audiovisual hallucinations, or eating disorders. (*Id.*). Mental status examination revealed logical but racing thoughts, intact thought content and associations, good insight and judgment with good attention and concentration with minimal distractibility. (Tr. 452). NP Barnett decreased Effexor to 75 mg every morning, began Lamictal titration to 100 mg, and began Latuda 40 mg. (Tr. 454).

Mallardi continued to treat at Portage Path, with regular appointments on July 11 and 24, August 14 and 28, and September 16 and 30, 2019. (Tr. 465-97). During his July 24, 2019 therapy appointment, Mallardi presented with anxiety and depression, and on examination, was agitated, had rapid speech, avoided eye contact, had impaired attention and concentration, fair insight and judgment, concrete and tangential thoughts, cooperative behavior and blunted affect. (Tr. 468). However, at his August 28, 2019 medication management appointment, his examination had returned to normal, with appropriate affect and mild anxiety and depression. (Tr. 472-73). NP Barnett discontinued Effexor because it caused mania and extreme irritability, increased Lamictal to 200 mg, discontinued Latuda for akathisia, and started lithium 300 mg for mood stabilization. (Tr. 474).

A November 19, 2019 sleep study confirmed obstructive sleep apnea and periodic leg movement disorder. (Tr. 592-94).

4

Mallardi followed up with Dr. Nguyen on December 2, 2019, for his hypertension. (Tr. 498-505). He was assessed with stage three (moderate) kidney disease and recommended to avoid nephrotoxic medications and increase fluids; Dr. Nguyen later confirmed this diagnosis on September 20, 2021 but made no additional treatment recommendations. (Tr. 502, 929). Dr. Nguyen stopped his medications and recommended monitoring blood pressure, limiting sodium intake, and exercising regularly. (Tr. 503-04).

On January 31, 2020, at an appointment with NP Barnett, Mallardi had average eye contact, clear speech, logical thought process and perceptions, good insight and judgment, normal and intact recent and remote memory, good attention and concentration with minimal distractibility, constricted/blunted affect, mild anxiety and moderate depression. (Tr. 628). He reported stable mood, some side effects with lithium, and denied medical issues. (*Id.*). NP Barnett decreased his lithium to 150 mg, started Wellbutrin 150 mg, and started trazodone 50 mg. (Tr. 630).

At follow up with Dr. Nguyen on June 1, 2020, Mallardi reported being concerned with adult autism and stated that his psychiatrist and mother were also concerned. (Tr. 649). Dr. Nguyen assessed Mallardi with right bundle branch block (RBBB) with left anterior fascicular block, t-wave inversion, and compulsive disorder. (Tr. 653-54). Dr. Nguyen recommended a stress test be completed as soon as possible, completed an EKG, recommended taking 81 mg aspirin, and to schedule follow up in three months. (Tr. 654).

On August 17, 2020, Mallardi again met with Dr. Nguyen, who assessed him with hyperlipidemia and greater trochanteric bursitis, left. (Tr. 898). She updated medications to include Ezetimibe 10 mg for hyperlipidemia and referred to orthopedic surgery for the bursitis and recommended follow up in three months. (Tr. 898-99).

5

On October 20, 2020, Mallardi treated with Carol Lewis, M.D., at Portage Path for medication management. (Tr. 1257). He reported positive results from the increased dose of buprenorphine. (*Id.*). Mental health examination was normal with good attention and concentration with minimal distractibility but only fair insight and judgment. (*Id.*). Dr. Lewis continued Lamictal, trazodone, and Seroquel at the same dosage; increased lithium to 300 mg; discontinued Wellbutrin; and started clonidine 0.1 mg for anxiety and Zofran 8 mg as needed for nausea and vomiting. (Tr. 1258). He reported doing well on these medications at his follow up appointments on October 29 and November 5, 2020, and Dr. Lewis continued his medications as prescribed. (Tr. 1244-54).

On November 17, 2020, Mallardi treated with NP Barnett and reported his medications were working very well with no side effects or other medical issues. (Tr. 1238). NP Barnett indicated stable mood and that he was sleeping well. (*Id.*). His mental status examination was normal and mood euthymic. (Tr. 1238-39). NP Barnett continued Lamictal, lithium, trazodone, Seroquel, and clonidine, and discontinued Wellbutrin and Zofran. (Tr. 1240). NP Barnett indicated his bipolar, opioid use, and trauma and stressor related disorders were stable or improved. (Tr. 1239-40).

On January 10, 2021, Mallardi treated with NP Barnett, who noted that he had not treated for bipolar disorder previously but was receiving medication management from Dr. Lewis. (Tr. 1023). He reported that his medications have been very useful. (Tr. 1024). He had some mild ongoing depression and anxiety but denied physical issues. (*Id.*). His mental status examination was normal and appropriate; he had good attention and concentration with minimal distractibility. (Tr. 1025). NP Barnett indicated Mallardi's bipolar and opioid use disorders were stable or improved and continued him on all medications. (Tr. 1026).

6

On April 21, 2021, Mallardi met with Dr. Nguyen for medical clearance for left shoulder arthroscopy with rotator cuff repair, subacromial decompression, open Mumford, possible biceps tendon releases; it was scheduled for April 29, 2021 with a Dr. Krupko.[1] (Tr. 913).

At an appointment with NP Barnett on May 12, 2022, Mallardi's mood was stable and euthymic, he was sleeping well, and he denied any side effects from medication or other medical issues. (Tr. 1091). On examination, he exhibited average eye contact, logical thought process, circumstantial associations, normal and intact thought content, good insight and judgment, normal and intact recent and remote memory, good attention and concentration with minimal distractibility. (Tr. 1086-87). NP Barnett continued his medications. (Tr. 1088).

Mallardi had similar results at his appointment with NP Barnett on August 12, 2022; his mood was stable, he was not experiencing medication side effects, and he denied any medical issues, although he did report poor sleep. (Tr. 1052). On examination, he had average eye contact, clear speech, logical thought process, intact associations, normal perceptions, good insight and judgment, normal and intact recent and remote memory, good attention and concentration with minimal distractibility, appropriate mood and affect, with mild anxiety, depression, and irritability. (Tr. 1052-53).

Mallardi met with NP Barnett on October 17, 2022 and reported having a difficult time recently after his girlfriend of 12 years moved out. (Tr. 1045). He requested medication to help with sleep and to calm him. (*Id.*). He also reported having started a new job as a dishwasher. (*Id.*). On examination, he had average eye contact, clear speech, logical thought process, intact associations, normal and intact thought content and perceptions, good insight and judgment, normal and intact recent and remote memory, and good attention and concentration with minimal

[1] Upon my review of the record, there is no indication that Mallardi underwent this procedure, nor that there was any subsequent treatment of his left shoulder.

distractibility. (Tr. 1045-46). His affect was constricted/blunted and his anxiety and depression were severe. (Tr. 1046). NP Barnett added Remeron 30 mg and Zyprexa 5 mg but made no other changes to his regularly prescribed medications. (Tr. 1047).

On December 13, 2022, Mallardi met with NP Barnett, who indicated his mental status examination was normal and appropriate; he had good attention and concentration with minimal distractibility. (Tr. 1031). He reported having no issues with his medications, felt the dose was accurate, and had no side effects; he also reported having no medical issues. (*Id.*). NP Barnett discontinued Zyprexa but continued all other medications. (Tr. 1033).

### C.    Medical Opinion Evidence

At the initial review level on October 22, 2019 state agency reviewing physician W. Scott Bolz, M.D., found Mallardi's medically determinable impairments would not result in severe functional limitations; he also noted Mallardi did not report any physical limitations in his daily activities, thus his physical impairments (obesity, hypertension, and sleep-related breathing disorders) were not severe. (Tr. 60, 69).

On October 23, 2019, state agency reviewing psychologist David Dietz, Ph.D., found that Mallardi had mild limitations in understanding, remembering, or applying information, and moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (Tr. 61). He further found Mallardi could maintain attention and make simple decisions in a setting without strict production standards, occasionally and superficially interact with the public, and adapt to a setting in which day to day duties are routine and predictable. (Tr. 63-64).

At the reconsideration level on April 10, 2020, state agency reviewing physician Diane Manos, M.D. affirmed Dr. Bolz's findings. (Tr. 78, 90-91). On April 8, 2020, state agency

reviewing psychologist Jennifer Swain, Psy.D., disagreed with Dr. Diez's findings and instead found Mallardi had moderate limitations in all functional realms. (Tr. 79). She further opined that he was capable of at least simple, routine tasks; could maintain attention and make simple decisions in a setting without production standards; was limited to occasional superficial interactions with the general public; and could adapt to a setting in which day to day duties are routine and predictable. (Tr. 81-82).

On March 4, 2020, Mallardi attended a consultative examination with Sudhir Dubey, Psy.D. (Tr. 518-26). He reported short-term memory problems, depression, anxiety, bipolar disorder, and PTSD since he was 15 years old. (Tr. 518). Dr. Dubey noted Mallardi was generally cooperative with testing and had good attention and concentration, stable mood, and provided good effort during testing. (Tr. 519). Dr. Dubey administered WAIS-IV testing; Mallardi obtained the following scores: 81 in verbal comprehension, 98 in perceptual reasoning, 71 in working memory, and 71 in processing speed; resulting in a full-scale IQ score of 78. (*Id.*). Mallardi reported receiving and benefiting from his mental health treatment. (Tr. 524). He was not working due to his history of mood-related problems and memory issues, as well as his criminal record. (*Id.*). On a daily basis, he could do most things on his own except for manage money; because of memory problems he let his grandmother or girlfriend manage his money for him. (*Id.*). Dr. Dubey diagnosed Mallardi with unspecified neurocognitive disorder, bipolar II disorder, and borderline intellectual functioning. (*Id.*). Dr. Dubey opined Mallardi would be able to understand, remember, and carry out multi-step instructions only with supervision; he could maintain persistence and pace to remember and carry out multi-step instructions only with supervision; he would have some issues dealing with coworkers and supervisors; he would have some issues dealing with work pressures. (Tr. 525-26).

On January 10, 2023, NP Barnett completed a mental health questionnaire. (Tr. 954-55). She reported that Mallardi has severe bipolar I disorder leading to a psychotic break and the commission of an act that brought about a prison sentence. He displayed extreme agitation, irritability, and risks breaking the law if he becomes psychotic. NP Barnett indicated that he is unable to work with the public. (Tr. 954). She opined Mallardi was unable to meet competitive standards in his ability to remember and carry out detailed instructions, maintain attention and concentration, ask simple questions, and manage regular attendance. (Tr. 954-55). He had no useful ability to function in the areas of working with others, completing a normal workday or workweek without interruption from psychologically based symptoms, performing at a consistent pace, interacting with the public, responding appropriately to supervisors, getting along with coworkers or peers, or maintaining socially appropriate behavior, responding appropriately to changes in work setting, and being aware of normal hazards and taking appropriate precautions. (*Id.*). He would be absent at least four days per week. (Tr. 955).

### D.    Administrative Hearing Evidence

On February 2, 2023, Mallardi testified before the ALJ that he lived with his grandmother and dog, had a valid driver's license, and was able to drive. (Tr. 697-98). He obtained a bachelor's degree in communications from The University of Akron and previously worked in radio and television. (Tr. 698). He was not working and was receiving SNAP benefits. (*Id.*). He had last worked in 2012, as a janitor. (*Id.*). Prior to that, he had worked at various radio stations. (Tr. 699-701). He had been fired from every job he had, save one. (Tr. 708).

Mallardi described seeing a psychiatrist, Wendy Barnett, at Portage Path. (Tr. 702). She prescribed him medication, including Lamictal, Zetia, Cozaar, Remeron, Zyprexa, Seroquel, Desyrel, and trazodone. (Tr. 702-03). He described them as helping, somewhat, and that he had

10

some side effects. (*Id.*). He was previously incarcerated for felony assault and kidnapping after a psychotic break. (Tr. 703). He had his last psychotic break in October of 2022. (*Id.*). He was hospitalized overnight at Akron General following this incident. (Tr. 703-04).

He is able to help his grandmother with chores around the house but needs reminders; she normally writes them down for him to complete. (Tr. 705). He also has memory and concentration issues and can only focus and pay attention for about 15 minutes. (Tr. 705-07). Mallardi described that he often forgets to complete chores, he rarely is able to concentrate on a two-hour movie and can only finish a one-hour show 50 percent of the time. (*Id.*).

Mallardi testified he also has physical problems with his left hip and left shoulder. (Tr. 707). He had had therapy for his left hip. (*Id.*). A specialist recommended he have surgery on his shoulder, but this recommendation came at the beginning of the coronavirus pandemic and he was unable to complete the surgery. (*Id.*). He also had a heart catheterization in early 2022. (Tr. 708).

The ME, Stephan Podrygula, a clinical psychologist, then testified. (Tr. 708-09). Dr. Podrygula testified that he had insufficient records to provide an opinion as of the alleged onset date in 2007, but that he did have records dating from May 2017 on which he could opine. (Tr. 709-10). Dr. Podrygula also expressed some reservations as to the completeness of the mental health records available, noting that the medical record at times referenced treatment for which there were no corresponding records available. (Tr. 710-11).

Dr. Podrygula offered that the treating doctors generally diagnosed Mallardi with bipolar disorder, however, he was more comfortable with the more generic label of mood disorder not otherwise specified, due to the possibility of Mallardi having a mood-induced and drug-induced

mood disorder. (Tr. 712). The record suggested that treatment with mood stabilizers had been quite effective, and that behavioral counseling and self-methods had also been helpful. (*Id.*).

Dr. Podrygula also indicated a diagnosis of anxiety disorder not otherwise specified (Tr. 712-13). He further opined that Mallardi's record indicated a possibility of a personality and impulse control disorder, although that had not been specifically diagnosed by any of Mallardi's treating providers. (Tr. 713). Dr. Podrygula opined that Mallardi's history of conflict in the workplace and quitting a job when his mood was unstable was supportive of a personality or impulse control disorder, and confirmed he had problems with coworkers and supervisors. (Tr. 713-14).

Dr. Podrygula disagreed with Mallardi's diagnosis of unspecified neurocognitive disorder, although there may be some cognitive limitations. (Tr. 714-15). He made this determination based on Mallardi's ability to complete a bachelor's degree and his past work as a radio announcer and in production despite having a full-scale IQ score of 78. (Tr. 715-16). For these reasons, he ruled out borderline intellectual functioning. (Tr. 716).

Finally, Dr. Podrygula affirmed a medically determinable impairment of PTSD due to Mallardi's history of trauma. (*Id.*).

Dr. Podrygula also opined that despite a history of polysubstance use disorder, he did not feel that medical marijuana was material to Mallardi's conditions. (Tr. 716-17). Furthermore, Mallardi appeared to be doing well in remaining sober from heroin and was on opioid antagonist medication. (Tr. 717).

Ultimately, however, Dr. Podrygula opined Mallardi did not meet or medically equal any of the listings related to his medically determinable impairments. (*Id.*). He reviewed the Paragraph B criteria related to Mallardi's diagnoses and determined he had no more than

12

moderate impairments in each of the functional areas. (Tr. 718-20). In short, Dr. Podrygula found Mallardi had no more than moderate impairments and was able to cope reasonably well with day-to-day activities. (Tr. 720). However, Dr. Podrygula noted Mallardi's consistent reports of psychotic breaks (although uncorroborated with hospital records) would indicate functional limitations in his ability to get along and interact with other people. (Tr. 720-21). Because of this, Dr. Podrygula opined Mallardi would need limitations of brief and superficial contact with coworkers, customers, clients, or supervisors. (Tr. 721-22). He could perform, at minimum, simple and repetitive tasks, and may be capable of complex tasks. (Tr. 722-23).

The VE then testified. The VE classified Mallardi's past work as a broadcaster or radio announcer, DOT 159.147-010, skilled, SVP 6, sedentary as classified and as performed. (Tr. 730-31). The ALJ then presented the following hypothetical to the VE: an individual of Mallardi's age, education, and past work, limited to non-exertional limitations, specifically limited to perform simple, routine, and repetitive tasks, but not at a production-rate pace, with only occasional interaction with supervisors, coworkers, and the public, and limited to tolerating only occasional changes in a routine work setting. (Tr. 731). The VE testified that the hypothetical individual could not perform Mallardi's past work because it was skilled. (*Id.*). However, the individual could perform other work, including unskilled, medium, SVP 2 jobs such as kitchen helper, DOT 318.687-010, 319,000 jobs in the national economy; industrial cleaner, DOT 381.687-018, 27,000 jobs in the national economy; and housekeeper, DOT 323.687-010, approximately 64,000 positions in the national economy. (*Id.*). The VE further testified that the jobs would be available for someone who needed both superficial and occasional interaction with others. (Tr. 731-33). The numbers would stay the same if the individual also required reminders twice a day to stay on task; it would not be unusual for a

supervisor to redirect an employee several times per day. (Tr. 733). It would be work preclusive for an employee to miss work, arrive late, or leave early two times per month or be off-task more than 10 percent of the time. (Tr. 736).

## IV. The ALJ's Decision

In her decision dated March 29, 2023, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.    The claimant has not engaged in substantial gainful activity since December 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: depression, bipolar disorder, drug induced mood disorder, anxiety disorder, posttraumatic stress disorder [PTSD], neurocognitive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work). The claimant can tolerate occasional and superficial interactions with supervisors, coworkers, and the public. The claimant is able to tolerate few changes in a routine work setting.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 20, 1968 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

14

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 676-84).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Mallardi brings three issues for this Court's review:

1. Whether the ALJ erroneously failed to comply with the previous order of this Court when she failed to support her findings and conclusions with substantial evidence;

2. Whether the ALJ erred at Step Two of the Sequential Evaluation when she failed to properly consider the totality of Mallardi's impairments when forming the RFC;

3. Whether the ALJ erred when she failed to properly evaluate the opinions of the treating and consulting sources in accordance with 20 C.F.R. 404.1520(c) and 416.920c.

(ECF Doc. 8, PageID 1337). I address each in order below. For the reasons that follow, I find no reversible error and recommend the District Court affirm.

### A. The ALJ supported her findings and conclusions with substantial evidence.

Mallardi first argues the ALJ erred by failing to comply with a stipulated remand of this Court and the subsequent remand order by the Appeals Council. (*Id.* at PageID 1345-46, citing Tr. 739, 743-46). The Commissioner responds by deeming this argument waived for lack of

17

sufficient argument. (ECF Doc. 10, PageID 1371). I disagree that this argument is waived, but nonetheless find it meritless.

I first note that courts within the Sixth Circuit are divided as to whether an ALJ's failure to follow an Appeals Council remand order may serve as independent grounds for reversal absent other error. *See, e.g.*, *Shope v. Comm'r of Soc. Sec.*, No. 2:14-CV-2055, 2015 WL 3823165, at *8 (S.D. Ohio June 19, 2015), report and recommendation adopted, No. 2:14-CV-2055, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015) (collecting cases). However, the majority of the courts in the Sixth Circuit have determined "federal courts lack jurisdiction to consider whether an administrative law judge complied with the Appeals Council's instructions on remand." *Id.*, *see also Cooper v. Colvin,* No. 5:13-CV-00217-LLK, 2014 WL 2167651, at *2 (W.D. Ky. May 23, 2014) ("Plaintiff's contention that the ALJ's decision does not comply with the Remand Order is not cognizable in this judicial review."). Therefore, to the extent that Mallardi argues the ALJ did not comply with the Appeals Council's order of remand, I decline to review.

Notwithstanding the foregoing, Mallardi also argues the ALJ failed to comply with the orders of this Court. That order remands for "further consideration of Plaintiff's claim, further development of the administrative record as necessary to determine whether Plaintiff is disabled within the meaning of the Social Security Act, and issuance of a new decision." (Tr. 739).

Nonetheless, it is apparent from the subsequent record that the ALJ did indeed do as instructed and followed the remand order from this Court to reconsider Mallardi's claim and issue a new decision. The previous decision at issue was determined on October 15, 2020 (Tr. 12-27) and contained records dating through June 6, 2020 (Tr. 27; *see also* Tr. 265-669). Subsequent to the remand orders, the ALJ issued a new decision on March 29, 2023 (Tr. 670-

18

90), indicating that she evaluated the prior administrative medical findings pursuant to 20 C.F.R. §§ 404.1520c and 419.620c (Tr. 678-82). This 2023 decision was supported by testimony obtained at a new hearing on February 2, 2023 (Tr. 691-738), at which an ME testified (Tr. 708-29), as well as a VE (Tr. 730-37). The decision was further supported by medical records dating through January 10, 2023. (Tr. 689-90, *see also* Tr. 855-1306).

Thus, the ALJ followed the instructions of this Court upon remand. She considered Mallardi's claim anew, obtained the necessary records from after the 2020 decision date, gathered testimony from both a VE and a ME, and considered the record in accordance with §§ 404.1520c and 416.920c to issue a new decision. I therefore see no error on which to recommend remand.

### B.      The ALJ did not err in her Step Two findings or in forming the RFC.

Mallardi further states the ALJ erred by failing to find any of his physical impairments severe at Step Two of the sequential evaluation, and by failing to consider these limitations or include appropriate restrictions in the RFC at later steps in the sequential evaluation process. (ECF Doc. 8, PageID 1347-49). In contrast, the Commissioner argues the ALJ's error was harmless, because Mallardi did not apply for disability due to physical impairments, and his recitation of physical symptoms does not overcome other evidence in the record showing he had no severe physical impairments. (ECF Doc. 10, PageID 1371-72).

The central question at Step Two is whether the claimant has a medically determinable impairment or combination of impairments that substantially limits his ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Claimants must make a *de minimis* showing that their impairment or combination of impairments is severe enough to interfere with their ability to work. *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987). Although the Step Two threshold is

19

"lenient," claimants still must show that their claim is grounded in medical evidence and affected their ability to work prior to the date last insured. *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988).

However, "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment—either singly or in combination with a claimant's other impairments—does not impose *any* work-related restrictions.'" *Patterson v. Colvin*, No. 5:14-CV-1470, 2015 WL 5560121, at *4 (N.D.Ohio Sept. 21, 2015) quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *6 (E.D.Mich. Feb.27, 2015). "Where an ALJ determines that non-severe impairments do not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *Patterson*, 2015 WL 5560121, at *4 quoting *Hicks v. Comm'r of Soc. Sec.*, No. 12-13581, 2013 WL 3778947, at *3 (E.D.Mich. July 18, 2013).

Thus, the ALJ may not ignore the impairments found non-severe at Step Two but must carry them through her consideration at later steps in the sequential evaluation process. "When formulating an RFC, an ALJ must consider the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotation marks and alteration omitted) citing *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe."). "Courts within the Sixth Circuit have repeatedly held that 'an ALJ's failure to adequately explain how an impairment affects an individual's RFC

20

may constitute reversible error.'" *Patterson*, 2015 WL 5560121, at *4 quoting *Katona*, 2015 WL 871617, at *7.

However, my analysis does not end merely with determining whether error occurred, but is balanced against whether that error was harmful. Indeed, the Commissioner must adhere to the Social Security Administration's own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights.  *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 654 (6th Cir. 2009). An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless. *Id.* at 655-56. This Court will not remand when it "would be an idle and useless formality."  *Kobetic v. Comm'r of Soc. Sec.,* 114 Fed. Appx. 171, 173 (6th Cir. 2004) (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969) (noting that in such instances courts are not required to "convert judicial review of agency action into a ping-pong game.")); *see also Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").

Here, it appears Mallardi is questing for that perfect decision, but one that appears will not give him the ultimate satisfaction he seeks – a favorable decision. Although it was error for the ALJ to fail to articulate her consideration of his physical impairments, if any, Mallardi has not met his burden to demonstrate that his physical impairments, even in combination with his mental health impairments, are severe enough to interfere with his ability to work.

For example, the state agency reviewing physicians did not find Mallardi had any severe impairments and stated "The evidence does not show that cl[aimant]'s [medically determinable

impairments] result in severe functional limitations. Cl[aiman]t also does not report any physical limitations in his daily activities. Physical is not severe." (Tr. 60, 78).

Likewise, Mallardi has failed to show his physical and mental impairments, in combination, are severe enough to interfere with his ability to work.

For example, Mallardi's self-submitted function report, dated September 30, 2019, does not disclose any physical impairments. (*See* Tr. 223-30). In response to the question of how his conditions limit his ability to work, he states he has an "[i]nability to remember things as well as work constantly with others. The severe bi-polar has limited my ability to perform daily tasks" but does not describe any other physical limitations. (Tr. 223). Similarly, when asked to check boxes outlining work related limitations, he only marks mental health limitations, and leaves all boxes pertaining to physical limitations blank. (Tr. 228). He also only describes difficulties relating to his bipolar disorder and does not mention physical impairments or symptoms. (*Id.*). Elsewhere in the record, his mental health providers in reviewing his symptoms during medication management sessions indicate Mallardi reported experiencing no physical issues. (*See, e.g.*, Tr. 1023, 1031). And the medical evidence demonstrates that despite a diagnosis of stage three (moderate) kidney disease, his doctor's only recommendation was to avoid nephrotoxic medications and increase fluids. (Tr. 502, 929). Similarly, on April 21, 2021, Dr. Nguyen provided a pre-surgical clearance for a rotator cuff repair to be performed by a Dr. Krupko on April 29, 2021. (Tr. 913). However, there are no corresponding records from Dr. Krupko, nor any diagnostic imaging records confirming a rotator cuff tear. Mallardi testified that the surgery was never performed. (Tr. 707).

Thus, my review of the record discloses little to substantiate Mallardi's claims of physical impairments. Much of the record is Mallardi's own report of his impairments, made either to the Agency or his providers. Few treatment records or diagnostic imaging records are available.

Therefore, I determine the ALJ's failure to find his physical impairments severe at Step Two, and failure to articulate her reasoning in not including physical limitations in the RFC at later steps in the evaluation was harmless error. Mallardi has not demonstrated his physical limitations and mental impairments would interfere with his ability to work. It would be futile for the Court to remand on this issue. I therefore decline to recommend the District Court remand.

**C.      The ALJ did not err in her consideration of treating and consulting source opinions.**

Finally, Mallardi argues the ALJ erred in her consideration of the treating and consulting source opinions given by NP Barnett, Dr. Podrygula, Dr. Dubey, and the state agency reviewing physicians. (ECF Doc. 8, PageID 1350-59). He argues the ALJ did not adequately consider the opinions supportive of limitations for his concentration difficulties, need for supervision, need for reminders, and ability to follow through with instructions, among other mental health limitations, and, as a result, the RFC did not adequately address these impairments. (*Id.*). Ultimately, Mallardi argues that the ALJ did not comply with the Appeals Council's order of remand and that her determination was not supported by substantial evidence. (*Id.* at PageID 1358-59). The Commissioner, in contrast, argues the ALJ's evaluation of the medical opinions, when viewed as a whole, was in accordance with the regulations requiring it be explained in terms of supportability and consistency. (ECF Doc. 1371-77). I agree with the Commissioner.

On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new

regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a).

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[3]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

And, throughout the decision, the ALJ must provide a sufficiently thorough explanation of his decision so as to facilitate subsequent review. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

I now turn to analyzing each medical source opinion under this standard.

### 1.    NP Barnett

The ALJ considered NP Barnett's opinion as follows:

> I find little persuasiveness in the opinion of counselor Wendy Barnett PMHNP, who stated in relevant part the claimant has "no useful ability to function" in terms of working in coordination with others, completing a normal workday free of interruptions, performing at a consistent pace without an unreasonable number and length of rest periods, engaging in any interactions with the public, supervisors, and coworkers, responding appropriately to changes in the work setting, and that the claimant would be absent from work four days per week. *Ms. Barnett's opinion is supported by her time spent treating with the claimant, and by some description of the claimant's symptoms. That said, she provides no explanatory support for the finding the claimant will absent from work four days per week. Nor does her opinion statement clearly provide support for the total preclusions as otherwise noted. Overall, her assessment is inconsistent with some of the claimant's noted functioning, from elsewhere in the record, including traveling out of state, going to a large concert, and going to Disney World. Her opinion also is inconsistent with many of the counseling notes from PPBH indicating the claimant has no serious complications in memory, concentration, and attention span.*

(Tr. 681) (citing to Tr. 469, 954-55, 1025, 1045, 1052, 1086).

I find no error with the ALJ's articulation of her consideration of NP Barnett's opinion. As emphasized in italics above, the ALJ explained her consideration in terms of "supportability" and "consistency" as the regulations require. And in looking to the record cited, it does not appear the ALJ mischaracterized the records or cherry-picked the evidence (despite Mallardi's contention that she only cited to three treating notes). Rather, when viewed as a whole, it appears the ALJ's decision regarding NP Barnett's opinion is supported by substantial evidence.

I therefore decline to recommend remand on this basis.

### 2.    Dr. Podrygula

Mallardi makes no colorable argument that the ALJ failed to appropriately consider Dr. Podrygula's opinion. Rather, he states "the ALJ appropriately discounted this testimony and found greater restrictions." (ECF Doc. 8, PageID 1356).

Accordingly, I find no articulable reason to recommend remand on this basis.

### 3.    Dr. Dubey

The ALJ considered consultative examiner Dr. Dubey's opinion as follows:

> I find some persuasive effect in the opinion of consultative examiner Dr. Sudhir Dubey Psy.D., who stated the claimant is able to concentrate on and carry out simple instructions, will have some issues dealing with coworkers and supervisors due to frustration, and will have some issues dealing with work pressures (7F8-9). *Dr. Dubey's opinion is supported by his examination of the claimant on March 4, 2020, and by discussion of observed signs and reported symptoms.* That said, his opinion statement is somewhat lacking in specificity. His assessment does not indicate specific limitations in terms of interacting with coworkers and supervisors, or tolerating work pressures. Thus, his assessment is of only some persuasive effect in reaching a conclusion concerning the claimant's residual functional capacity.

(Tr. 682). Here, the ALJ provided a clear explanation of her determination in terms of supportability. I note the ALJ does not explicitly use the term "consistency" in her consideration of Dr. Dubey's opinion. However, that, in itself, does not constitute reversible error. When viewing the ALJ's RFC determination as a whole, it becomes clear she considered the consistency of Dr. Dubey's opinion against the record. For example, elsewhere in her decision, the ALJ references Dr. Dubey's examination by stating:

> On March 4, 2020, the claimant attended a consultative examination. At that examination, he reported a history of suffered abuse as a child, from his stepfather. He reported many problems in the past with workplace interactions, especially with supervisors. The claimant underwent IQ testing, and scored a full scale IQ of 78 per the WAIS IV. However, I do not find this IQ score to be a valid representation of his intelligence, as it is inconsistent with the claimant's ability to earn a bachelor's degree in communications from The University of Akron, and it is inconsistent with his past work duties. Also at the examination in question, the claimant reported having a girlfriend and having good relationships with his family.

He did not need simple or multi-step directions repeated, and understood all the questions asked of him.

(Tr. 680) (internal citations to the record omitted). I note here the ALJ does describe Dr. Dubey's examination in terms of consistency with other evidence of record – namely, his full-scale IQ scores as inconsistent with his ability to complete a bachelor's degree and work in broadcasting for a number of years. The ALJ also described how Mallardi's problems interacting with supervisors is inconsistent with his ability to interact with or understand the questions Dr. Dubey asked of him, and inconsistent with the relationships he held with family and significant others. The ALJ also contrasted Dr. Dubey's examination against the opinions given by the state agency reviewing psychologists to determine Mallardi required additional limitations including occasional and superficial interactions with coworkers and supervisors. (Tr. 681).

Thus, even if an ALJ does not specifically use the words "supportability" and "consistency," it does not necessarily mean the ALJ failed to consider those factors. *Hardy v. Comm'r of Soc. Sec.,* No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021). When read as a whole document, it appears the ALJ considered Dr. Dubey's opinion in context and against the other opinions and medical evidence available.

I see no reversible error on which to recommend remand.

### 4. State Agency Reviewing Psychologists

Finally, the ALJ considered the state agency reviewing psychologist opinions as follows:

I find some persuasive effect in the opinions of state agency psychologists Drs. David Dietz Ph.D. and Jennifer Swain Psy.D., who stated the claimant could perform simple routine tasks, could make simple decisions in a setting without strict production standards, is limited to occasional and superficial interactions with the public, and can adapt to a setting in which day to day duties are routine and predictable. *These two opinions are supported by a review of the available medical evidence, and by discussion of that specific evidence. Their conclusions are generally consistent with a record that shows the claimant's moods have been stable and responded well to medications. Their conclusions are consistent with*

27

*frequent reports of the claimant showing no signs of significant deficit in memory, concentration, and attention span. Their opinions are consistent with a record that shows the claimant better able to maintain his composure in large crowds and in one-on-settings, such as with medical providers.* However, I find the limitation to occasional and superficial interactions with the public also extends to coworkers and supervisors, given the claimant's reported difficulties getting along with such persons in the past.

(Tr. 680-81). I again find no error with the ALJ's articulation of the state agency reviewing psychologists' opinions. The ALJ explained her consideration in terms of "supportability" and "consistency" as the regulations require and I find no reversible error.

I therefore decline to recommend remand on this basis.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Mallardi's applications for DIB and SSI be affirmed.

Dated: May 15, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).